Department of Homeland Security, Mr. Roth. May it please the Court. Your Honor, I'd like to address the agency's argument that the charges in this case should be sustained because the administrative law judge made demeanor-based credibility findings and those findings are entitled to Our first position on charge one, which is a false statement charge, is that the Board sustained that charge on a theory not set forth in the charge letter or the proposal letter. And it is our position, Your Honor, that any charge, particularly in a false statement case, has to be strictly construed and the charge has to be sustained based on the charge and the specifications in the letter itself and cannot be modified by the Board or converted into a more convenient theory. The charge here, quite simply, is that on November and in his affidavit on March 31st, 2004, Appellant stated that on November 25th, 2003, he did not conduct a debriefing of the informant because his workgroup was preoccupied conducting a controlled delivery of marijuana, presumably on that occasion. If you look at the actual statement that Appellant made and that is referenced in the letter itself, he never said that there was no debriefing on November 25th and he never said that there was a controlled delivery on November 25th. Those are all things that were implied. Didn't he lead the agency to believe that no debriefing occurred on November 25th? Your Honor, there is a difference. Let's assume that's true. And I disagree with that, Your Honor, but let's assume it's true. Under this court's decision in the Ludlam case, Ludlam versus the Department of Justice, there's a distinction between a false statement and a misleading statement. If the agency decides to go with a false statement, they have enhanced their burden, and that means they have to prove that a statement was knowingly made and that it was made with the intent to defraud the agency. Needless to say, if in the first instance he didn't make the statement at all, they can't meet their burden of proof. Mr. Roth, in a circumstance like this where lives are at stake and so much is hanging by what could be instant judgment, don't Mr. Bencomo's supervisors have to have absolute and complete trust in him? Judge, I agree with that. I can't dispute the case law that basically says that law enforcement officers are held to a higher standard of conduct. I don't dispute that. But, Your Honor, it's absolutely clear that the problem in this case was not the communication from Mr. Bencomo to his supervisors, but the real problem was that after his supervisors were told by him of the murders on November 23, 2003, his immediate supervisor, Mr. Compton, did not in turn inform his supervisors. And that was the principal problem. There is none of the agents, as I've indicated in my disparate treatment argument, Your Honor, none of the agents involved and none of the supervisors involved in this matter are completely blameless. They were dealing with an informant who was obviously very disreputable and quite frankly he was able to pull the wool over all of their eyes and they all could have been a little bit more diligent in what they did. The problem is that my client, Mr. Bencomo, was the only one singled out for any substantial discipline at all. Only one other agent in this entire matter got a three-day suspension and none of the supervisors received... they weren't even investigated, let alone receive any discipline at all. Also, Your Honors, I think that the statement that Mr. Bencomo made on March 31, 2004 can't be viewed in a vacuum. All of these false statement cases have to be viewed in a totality of the circumstances. That affidavit was a very bare-bones affidavit done by Mr. Bencomo before he reviewed anything. He had not seen his notes, he had not seen reports. He was interviewed at length about the same incidents in September of 2007, four and a half years later. And at that point he fleshed out his position with respect to this matter. And he made it clear there, it was clear there that he never said that there was no debriefing that occurred on November 25th. He even left open the possibility that it did. He suggested that there was a debriefing that happened at some point before Thanksgiving. He just couldn't remember exactly when it was. What he said was that the full debriefing did not occur until December 1st, which, as far as he knew, was completely true because he had a report done by Mr. Ortiz about that debriefing and was able to refresh his recollection about that debriefing. Weren't there five charges sustained? There were, Your Honor. And I was just talking about the first one. I'll move to the other charges, Your Honor, that I think are also significant because they're also false statement charges, and that's Charges 5 and 6, involving a completely different informant. And, Your Honor, I agree that the administrative law judge made credibility-based findings, as between Mr. Bencomo and Mr. Weatherly. But it's our position that those credibility findings were irrelevant to the key issue in the case, and that was the issue of specific intent. A payment was made to an informant, allegedly of $1,500 in August of 2002. The form, which is in the appendix at page 983, requires not only that the informant sign indicating that she received the payment, but also that the agent making the payment and a witness sign. So the credibility conflict that the AJ focused on here was between Mr. Bencomo and the witness, Mr. Weatherly. Mr. Bencomo took the position at the hearing, I don't remember this event. I've paid hundreds and hundreds of informants over the years. This happened back in 2002. He was not interviewed until 2007, five years later. And then the agency didn't even bother to show him the form, which he specifically requested they wouldn't show it to him. But he took the position, I don't know what specific transaction you're talking about, but I can tell you that there's never been a situation in my history where I signed one of those forms where it wasn't accurate. I paid the informant specified in the form. He gave a generalized statement because he couldn't be more specific because they refused to show him the form. Five years after the fact, they approached Mr. Weatherly, and Mr. Weatherly says he's shown a photograph of the informant. And five years after the fact, Mr. Weatherly says, that doesn't look like the woman we paid. Now, he never saw the informant herself. He only saw a photograph five years after the fact. And based on that credibility contest at the hearing, the administrative law judge found Weatherly more credible than a whole host of other pieces of evidence. I would suggest to your honors that the issue of specific intent on that particular charge was never dealt with by the A.J. at that hearing. The issue is, why would Mr. Bencomo do what he is alleged to be done? And the only evidence, the agency took no position on that at the hearing at all. The only evidence in the hearing at all on that issue was a hearsay statement. They did not call the informant at issue at the hearing. They put in hearsay statements of her interviews with agents. And she, the only claim that she ever made was that Mr. Bencomo had other sources that were apparently undocumented, which he had to pay. So he would solicit her to sign a form. He would pay her. He would pay her. She would return the money with the exception of $500 for her efforts. And Mr. Bencomo would use that money to pay other unspecified, unknown, undocumented informants. Now, nobody provided any information about that at all at the hearing. And the problem is, the informant, when she was interviewed, never took the position that that scheme happened with the payment at issue. She claimed it happened on a $4,000 payment and a $6,000 payment. Well, we know that's false, because the $6,000 payment that she got wasn't even an ICE payment. It was a Sheriff's Office payment, and Mr. Bencomo had nothing to do with that. The other $4,000 payment was witnessed by Mr. Bencomo and Mr. Hernandez, and they both testified, they both stated, that she in fact got the $4,000. She never said that she entered into this scheme with Mr. Bencomo on the payment at issue, and she couldn't have, because if you understand her scheme, the way she characterized the scheme, she would have had to sign the form to get the money and return the money to Mr. Bencomo, and the only evidence in the record is that she didn't sign the form. That's what she told the agents, that signature is not my signature. So, even though there was a credibility determination made between the appellant and Mr. Weatherly, in fact, the real credibility issue was between the informant and Mr. Bencomo. The informant never testified, only hearsay in the record, and your honors, I understand that hearsay is permissible at merit board hearings, but there is a limit. Under the Borning Cough case, a board case, if a witness like Mr. Bencomo comes in and testifies live, and puts his credibility in issue, and is cross-examined, that is worth infinitely more than a hearsay statement made by an informant, where we only have a piece of paper that cannot be cross-examined. Would you like to save your rebuttal? Yes, thank you, your honor. Thank you, your honor. May it please the court. The court should affirm the board on all five charges, and on the penalty determination. I'd like to go ahead and start where my esteemed colleague began, which is with respect to the charge. The statement that Mr. Bencomo made was that the full debriefing was not conducted until December 1st, 2003, because members of my group were conducting a controlled delivery, and then it goes on. But the evidence showed, and the trial judge held, that the full debriefing was actually done on November 25th, 2003. And so that statement itself was directly false. Also, the fact that his group was conducting a controlled delivery at that time, that did not take place until several days after the debriefing. Mr. Dinser, these are very extreme circumstances. Now, the first time Mr. Bencomo reports a murder involvement with CS-913, he's patted on the head and told to be careful next time. Was that a signal to him that this investigation had to go forward no matter what? A signal which he followed when he was careful to not jeopardize the investigation downstream? Not at all, Your Honor. In fact, it was a clear statement to both the petitioner here and to his group by people way up the chain that they wanted to keep a careful eye on what this informant was doing, and to make sure that this informant did not participate in any further murders. And so there was a clear statement that if there was any participation at all, that that had to be ordered up the chain. So, no, just the opposite, Your Honor. It led to clear, careful oversight of what was going on, and Mr. Bencomo was supposed to have a role in that oversight. He was sometimes an acting supervisor and one of the chief people on this case, and part of his job, especially when debriefing informant 913, was to, if he got any information about the fact that he had participated in another murder, that that information would immediately go up the chain, which is why the second charge that the witness faced had to do with the fact that he violated his supervisory instruction on providing that information up the chain when he heard it on November 25, 2003. So, no, his supervisors took it very seriously, which is why the punishment of removal attached to his failure to provide that information up the chain. Now, Rico, Compton, and Ortiz get little or no discipline for involvement in the same affairs. Why is that? Well, see, Your Honor, on November 25, when 913 is brought in, the only other person in the room besides the petitioner is Mr. Rico, who's only been with the office about five or six months. So Mr. Bencomo at that time is actually acting as a general supervisor, so he's in charge. Mr. Rico takes good notes. We have the notes that he took that show that there was a full debriefing. Mr. Rico passes those notes to Mr. Ortiz, who does fail to read them, but Mr. Bencomo doesn't report the information up. It's his job to report the information up as a supervisor. On the 1st, December 1st, there is no further discussion about these murders, at least in the detail that there was on the 25th. So Mr. Ortiz doesn't really know about them. He did fail to read the notes and to write a full report, and he is suspended for three days for that. But Mr. Bencomo, as the acting supervisor, as the person in charge, as the person who did the primary questioning on the 1st, he is the person who ultimately is responsible for making sure these things happen, and his failure to do so results in a more significant penalty, which was appropriate, not only because he was a supervisor and because he didn't make sure these things happened, but because he was involved in several things. He was involved in the decision in the failure to report up. He was involved in which neither of the other gentlemen had that responsibility. He was involved in the failure to write a report about what happened on 11-25, and he was involved in the false statement that he made, and probably most significantly the false statement that he made in an affidavit a few months later. Mr. Ortiz was not similarly involved in any sort of ex-post cover-up? Not at all. There is no allegation that Mr. Ortiz made a false statement, and so he was punished specifically for his failure to get the report and to get that information out. Mr. Rico, as sort of the junior person, it was understood that he was deferring to Mr. Bencomo, and there wasn't that type of punishment. What was the evidence of intent for the fifth and sixth charges? I believe that's your hardest case right there. And I will point out that on the Douglas Factor form, Mr. Weber indicated that each one of these charges is sufficient to support the removal. Mr. Weber did, but then the AJ and the board, if I remember right, held that they were holding cumulatively that the charges sustained, right? Am I wrong about that? Isn't the board's review based on the cumulative charges and not identically a holding that each individual charge would support? I do know that the administrative judge cited and I believe relied upon Mr. Weber's that each factor is enough at A-22, in part because charge four was not sustained, and that one was struck down, so it wasn't a full set of them. I don't recall that the board did that, Your Honor. But turning to your question about charge five and six, form 293 showed $1,500 going to 935. Mr. Bencomo made the payment. Mr. Weatherly was the witness, and that form can be found at A-983. What the court found was basically, ultimately, she had two people who were testifying. Mr. Bencomo, who said he didn't remember, and Mr. Weatherly, who said, I saw the person who received the money. It wasn't the right person. Even if his testimony five years later, without seeing the witness, only a picture, people change over five years, a lot changes over five years, even if that's credible, is that enough to sustain this charge? Yes, Your Honor. Ultimately, and the trial judge does that at A-18. Ultimately, that's the trial judge's job, is to sit there, and you've got two people, one who's saying, I don't remember. I wouldn't have done this, but I don't remember. And the other one is saying, I do remember. I was in that car. This is not the person. And ultimately, that's what the trial judge, and she clearly relied on credibility determination. She believed that Mr. Weatherly was more reliable. His testimony was clearer, and she reached that conclusion. And quite honestly, Your Honor, somebody has to, and that's her job. She's the only person who's in the room, and obviously this court defers to the trial judge when they make those specific credibility determinations. My esteemed colleague references 935's role. 935 really didn't have a role in the trial judge's conclusion. The trial judge considered all of the evidence, of course, but ultimately it came down to the people she saw testify, Mr. Weatherly and Mr. Van Como. She ultimately decided that Mr. Weatherly was the more reliable one. Did Mr. Weatherly say outright he didn't say CI-935, or did he say this picture doesn't look like the girl we paid? I'm wondering how equivocal is that? My understanding is he said that this was not the person. He identified the person who received the money, the way he described it, as a heavyset Hispanic woman, and that that wasn't the person who he saw in the picture. So that was the testimony that was relied on by the administrative judge at 1788. Even if that establishes that the money was paid to the wrong person, how does it establish the intent? If Mr. Van Como was the person running this and in charge of this confidential informant, he knew who the right person was. This apparently took place in a car. The person sitting in the back who he's handing money to is someone who he knows is not 935. If he did those actions, there's no way that that's an accident and you're accidentally dropping something. That action would show its intent. What the administrative judge found at A18, and I'm going to quote, I find that the appellant submitted a false document with the intent to mislead the agency. So she made that specific finding based on the totality of the evidence and the testimony that she saw. My colleague asks the question, why would he do this? Quite honestly, that's not an element of the charge. One can spin possibilities about why he did it, but obviously that's not an element. It might have been for personal gain. It might have been to protect some other witness. How did this issue even come up? I'm just confused. Five years later, how does it suddenly arise that there's a person five years earlier that maybe he didn't pay the right money to the right person? My understanding is as part of the investigation into the Santillan investigation, a discussion was had with 935. Yes, a discussion was had with 935 who raised issues about payments and inconsistencies. And that led the investigators to talk to Mr. Weatherly and say, you witnessed this payment, what happened? And they showed the picture to Mr. Weatherly and said that's not the person we made the payment to. Which is why they have the witness process in the first place. One of the questions is, why does the judge rely on the witness? That is why the witness is sitting there, to make sure that the right person is paid and that somebody can attest to that. And so, ultimately, it came down to the question of was the money given to the right person? Now, counsel suggests, well, 935 is not reliable. Well, obviously, we're not relying on 935's testimony. But also, 935 did say, and it was hearsay, but did say that that's not her signature on the 293 form. So, Mr. Bencomo is the only person who signed that form who says that this transaction actually took place. But nobody relied. It didn't seem to me that the A.J. relied on 935 at all, not even on her claim that that's not her signature. She seemed to be inherently unreliable. She waffled around with her stories and all that. So, even though that is a piece of the evidence that was arguably before the board, I mean, you agree that the A.J. did not rely on it. Only to the extent that, obviously, the judges assumed to have taken everything into account, and so that was part of sort of the background. But she did not cite that as part of the evidence upon which she based her conclusion. But, obviously, the credibility determinations that she did make are virtually unreviewable. The counsel discusses what happened in 2007 and the interview that took place during 2007. Nothing that was said in 2007 affects the fact that a false statement was made in 2003. He might try to clean it up a little bit, but, quite honestly, that he had already made a sworn false statement. And to emphasize, this is a law enforcement officer who could be called upon to testify in criminal proceedings, understood the nature of making a false statement, understood the nature that his testimony, if false, could put someone in jail, and so his supervisor clearly took that seriously. The only other point, it didn't come up, but just briefly, is the judicial estoppel. Of course, you find, as the Board did, that there's no judicial estoppel here and that the government could correctly bring a charge against Mr. Bencomo regarding his misconduct. And unless the Court has any other questions... Thank you, Your Honor. Mr. Dinsher, Mr. Roth, you have two and a half minutes. Thank you, Your Honor. Very briefly, Your Honor asks, how did this payment to CS-935 come up? It came up wholly independently of the 913 investigation. What happened is, 935 was an informant for ICE for a relatively short period of time, 2002 to 2003. She then gets deactivated, but she stays in the drug business independently. And in 2005, she's arrested, coming through the border with marijuana. As soon as she's arrested, she lies and says, Bencomo knows all about this. Well, they call Bencomo in, and Bencomo says, I don't know anything about this, she's on her own. She then starts making the allegation in the interest of trying to get leniency on her criminal case, because she now knows that Bencomo's not going to help her. She then starts making allegations for the first time about Bencomo, claiming that she didn't get certain payments. That's how it came up. At some point, the investigation of 913 and 935 get merged together against Bencomo, but they arose wholly independently. Yes, with respect to the issue of penalty, although the deciding official claimed that each and every charge would have supported a removal, which obviously lacks credibility, because Charge 3, which Mr. Ortiz was essentially convicted of, received a three-day penalty. So that doesn't mean much. And yes, my interpretation of what both the AJ and the full board found was that these charges cumulatively result in a removal. I don't think there was any attempt at all by the board itself to parse these things out and indicate which ones would support a removal in and of themselves. And of course, as your honors know, either this matter, if not all charges are sustained, this matter could either be remanded or your honors could, on your own, decide what is the maximum reasonable penalty under the circumstances.  Thank you very much, Mr. Roth.